IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Veronica Oglesby, | ) | Case No.: 8:19-cv-1573-JD |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM OF OPINION** |
| | ) | |
| Professional Transportation Inc. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter came before the Court by way of a trial before an advisory jury, pursuant to Rule 39(c),[1] Fed. R. Civ. P., in an action brought by the plaintiff, Veronica Oglesby ("Plaintiff"), against the Defendant, Professional Transportation, Inc. ("Defendant" or "PTI"), alleging she was improperly classified as an exempt employee under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, et seq., and thus denied overtime payments at time and a half her regular rate for all hours worked over forty (40) in a work week. Defendant contends that Plaintiff was employed in a position that was exempt from the overtime provisions of the FLSA, in particular, Defendant contends that Plaintiff was employed as an exempt administrative employee. For the following reasons, the Court finds that the administrative exemption applies, and Defendant correctly classified Plaintiff as exempt.

---

[1] Rule 39(c), Fed. R. Civ. P., provides, "[i]n an action not triable of right by a jury, the court, on motion or on its own. . . may try any issue with an advisory jury." This case was tried before an advisory jury with the court determining whether the Plaintiff falls within the scope of an FLSA exemption because it is ultimately a legal question. See Walton v. Greenbrier Ford, Inc., 370 F.3d 446, 450 (4th Cir. 2004); see also n. 5 infra.

1

**FINDINGS OF FACT**

Plaintiff, a resident of Norris, South Carolina, began her employment with PTI in October, 2008, as a Field Safety Officer (FSO).[2] Throughout her employment, she reported to the Senior Director of Safety, Bobby Vincent. In her job, Plaintiff was expected to provide leadership and to motivate others to follow all appropriate safety standards. She was responsible, along with other FSOs, for improving PTI's safety culture by engaging with team members and providing them with the tools to be successful. Her job involved travel to the various brick-and-mortar facilities of the Company, and engaging in safety audits, training, accident investigations, and other important risk management functions. She was reclassified as a Senior FSO in 2015 due to her tenure, her extensive knowledge of the industry and, in particular, her expertise in safety. At that time, Plaintiff's salary was in excess of $51,000.00 per year, of which she received the same amount every two weeks regardless of the hours worked.

Plaintiff's duties as a Senior FSO, while requiring travel, were related to the safe operation of PTI's motor vehicles, investigation of accidents, gathering factual information and preparing accident reports. These duties were non-manual labor activities related to the safety (i.e. management) of PTI's busines. Moreover, Plaintiff determined whether safety standards had been met, and she provided leadership to establish a safety-conscious culture through communication and engagement with other employees. She engaged others and provided them with the tools necessary to be successful, such as safety briefings and visibility cards. She was also responsible for conducting audits to make sure locations were in compliance with necessary safety

---

[2]    PTI is comprised of nearly 5,000 employees who provide transportation services to some of the largest companies in the railroad industry, among others. For example, PTI contracts with railroad companies throughout the continental United States to transport oil crews, barge crews, construction crews, and railroad crews from location A to location B through its professional drivers. It provides this service twenty-four (24) hours a day, seven (7) days a week.

requirements. There were a number of audit tools that she utilized, including: 1) DriveCam[3] audits; 2) Hours of service audits; 3) Location visits; and 4) Total Risk Assessment. As a Senior Field Safety Officer, Plaintiff worked with management at a site to ensure that any coaching deemed necessary by the incident caught on the DriveCam was given to the employee. If an employee accumulated sufficient "points" for unsafe acts, they could be pulled from service at her recommendation, or the recommendation of the Director, retrained, and put back to work. Plaintiff was involved in the retraining of a given employee if she was present at a site where the training was needed. Plaintiff also did ride-alongs with drivers to ensure that they were following all safety procedures. If the driver was operating in an unsafe manner, Plaintiff could make a recommendation to pull a driver from service based on Plaintiff's experience, training and education.

Plaintiff also conducted Service Hour Audits, which encompassed looking at a driver's hours to see if they are in excess of standards that are set by the Company. Indeed, Plaintiff was instrumental in changing Defendant's hours of service policy by noting her concerns about the former policy, pushing it up the chain of command and getting the company standard changed. Plaintiff would also conduct location visits which included driver engagement, van inspections, branch manager engagement, training drivers, doing "ride-alongs" and "ride-behinds." A ride-behind involves following a driver to see if they drive safety. Plaintiff decided if a ride-behind would be conducted. Driver engagement involved one-on-one conversations between a driver and an FSO, the purpose of which was to determine whether the individual understood his/her role and responsibility for safety.

---

[3] A DriveCam audit encompasses a review of the various "incidents" caught by the DriveCam device in each vehicle and working with the management team at that location to address the unsafe act or "incident."

Plaintiff made recommendations to Bobby Vincent on what locations needed site visits, and she would send a written notice to a branch to let them know she was coming and to identify her goal for the visit. During a site visit, she would review with management trends she saw in the accident data. Plaintiff's job duties required her to be a "strategic consulting partner to the senior management," and after problems and solutions were discussed with the management team, she worked to get the information down to the drivers. This effort was accomplished through the training of drivers, branch managers and directors (over several branches). Training was often a product of a branch's noncompliance with safety directives and that noncompliance was identified through audits conducted by Plaintiff.

Plaintiff's duties also required her to conduct accident investigations.[4] In investigating an accident, Plaintiff might review the DriveCam feed to learn what she could about the accident. She looked to see if the driver had any prior accidents. Plaintiff might also review pictures of the vehicle, if appropriate. As a Senior Field Safety Officer, Plaintiff would make a recommendation to classify an accident as preventable or non-preventable. If she determined the accident was preventable, a "just cause" document was prepared explaining why the accident was deemed "preventable." Plaintiff would then recommend what action should be taken with the driver. If Plaintiff determined the accident was non-preventable (meaning the driver did everything reasonably possible to avoid the accident), Plaintiff would recommend no action. Also, if training or retraining were not options, Plaintiff would make recommendations on what options were best when dealing with any safety issue, including accidents. While Senior Director of Safety Vincent

---

[4] Plaintiff also assisted branches that experienced a high frequency of accidents in preparing a safety action plan. The safety action plan was the result of data analysis done by Plaintiff. In conjunction with the branch manager, Plaintiff would decide what needed to be done to address apparent safety deficiencies. Plaintiff reviewed the goals in the action plan to make sure they were SMART – Specific, Measurable, Attainable, Realistic and Timely. Plaintiff then followed up with the Branch on their action plan to ensure they were making progress.

made the ultimate decision on what might happen to a driver in a preventable accident, he relied on the Senior Field Safety Officer to review the information available and give him an informed recommendation. When she made a recommendation to the Senior Safety Director Vincent, he sometimes agreed, sometimes disagreed, and sometimes he sent her back to rethink the matter.

Plaintiff filed her Complaint in state court on or about April 30, 2019. In her complaint, Plaintiff asserted that she was improperly classified as an exempt employee under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, et seq., and thus she had been denied overtime payments at time and a half her regular rate for all hours worked over forty (40) in a work week. (DE 1-1.) Plaintiff filed her Complaint as a collective action under the FLSA seeking to represent herself and all other employees similarly classified as Field Safety Officers for Defendant. (DE 1-1, ¶2.) Defendant timely removed the case to federal court based on federal question jurisdiction on May 31, 2019, and Defendant filed a timely Answer to the Complaint on May 31, 2019.

Plaintiff filed her Motion for Conditional Class Certification on September 30, 2019, seeking a conditional certification of a class of about ten (10) Field Safety Officers. Defendant filed its Memorandum in Opposition to Conditional Class Certification on October 25, 2019. (DE 24.) Plaintiff's Motion for Conditional Class Certification was denied on October 13, 2020. (DE 36.) Thus, this case proceeded as a single plaintiff case under the FLSA. Plaintiff resigned her position with PTI effective July 28, 2020.

## LEGAL STANDARD

In FLSA exemption cases, "[t]he question of how [employees] spen[d] their working time . . . is a question of fact," but the ultimate question of whether the exemption applies is a question of law.[5] Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714, 106 S. Ct. 1527, 89 L. Ed. 2d

---

[5] The parties disagreed on the mode of trial for this case. Defendant argues that the question of exempt status that is before the Court is essentially a legal question that is not within the province of a jury

739 (1986); see also Shockley v. City of Newport News, 997 F.2d 18, 26 (4th Cir. 1993) (noting that the significance of an employee's duties can also present questions of fact). "FLSA exemptions are to be 'narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within [the exemptions'] terms and spirit.'" Desmond v. PNGI Charles Town Gaming, L.L.C., 564 F.3d 688, 692 (4th Cir. 2009) ("Desmond I") (quoting Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392, 80 S. Ct. 453, 4 L. Ed. 2d 393 (1960)). See also Pugh v. Lindsay, 206 F.2d 43, 46 (4th Cir. 1953) ("Since the Act is remedial in nature, the exemptions contained therein must be strictly construed, and it is incumbent upon one asserting an exemption to bring himself clearly and unmistakably within the spirit and the letter of its terms."). In this circuit, employers must prove application of the exemptions by clear and convincing evidence. See Desmond I, 564 F.3d at 691 n.3.

Generally, the FLSA requires that employers pay overtime in the amount of one-and-one-and-a-half times an employee's regular rate for each hour their employees work in excess of 40 per week. 29 U.S.C. § 207(a)(1). The Act contains some exemptions, to include an administrative exemption that exempts "any employee in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). To receive the benefit of the administrative exemption, the Defendant must prove by clear and convincing evidence that: 1) The Plaintiff was compensated on a salary or fee basis at a rate of not less than $684 per week, exclusive of board, lodging, or other facilities[6]; 2) The Plaintiff's primary duty is the performance of office or non-manual work

---

to decide. Plaintiff, on the other hand, contends that there are "factual issues" that must be decided by a jury. Following jury selection on July 12, 2021, the Parties did not object to the Court's use of an advisory jury regarding the factual issues as to the three elements of the application of the administrative exemption under the FLSA. See n. 1, supra.

[6]     During the course of the trial, the Parties stipulated to the fact that the Plaintiff worked more than 40 hours per week in some workweeks. At the close of Plaintiff's case, Defendant moved for a Rule 50 Fed. R. Civ. P., motion for judgment as a matter of law. The Court granted Defendant's motion because there was insufficient evidence to create an issue fact for the jury and the Plaintiff conceded Element 1.

6

directly related to the management or general business operations of the Defendant or the Defendant's customers; and 3) The Plaintiff's primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. See 29 C.F.R. § 541.200(a).

## **CONCLUSIONS OF LAW**

This Court held a three-day jury trial on Plaintiff's FLSA claim and Defendant's administrative exemption defense. The only issues for the jury to deliberate were related to Element 2 regarding whether the Plaintiff's primary duty is the performance of office or non-manual work directly related to the management or general business operations of the Defendant or the Defendant's customers, and Element 3 regarding whether Plaintiff's primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.[7] After receiving the testimony, carefully considering all the evidence, weighing the credibility of the witnesses, reviewing the exhibits and arguments of counsel, and studying the applicable law, this Court makes the following determination. The Court notes that to the extent any of the Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

The Court finds that the parties have stipulated to the fact that the Plaintiff worked more than 40 hours per week in some workweeks, and the Court has already found that Element 1 of the

---

Accordingly, the Court found that Element 1 of the Administrative Exemption to the FLSA had been met, and the Plaintiff was compensated on a salary basis above the minimum weekly rate, which covered all hours worked.

[7]     During deliberations, the jury asked for additional information and a copy of the law beyond the Court's jury charges on the FLSA. Following deliberations, the jury advised that it reached a unanimous verdict regarding the question related to Element 3, but it could not come to an agreement as to the question related to Element 2. Given the jury's advisory capacity, the Parties agreed to accept the jury's verdict for question 3 only. In light of the jury's confusion (no verdict) regarding the Plaintiff's primary duties *vis a vis* its unanimous verdict regarding the degree to which Plaintiff exercised discretion and independent judgment in carrying out those duties, the Court gave little weight to the jury's advisory answer.

Administrative Exemption to the FLSA has been met and the Plaintiff was compensated on a salary basis above the minimum weekly rate which covered all hours worked.

As to the second element, the Court finds that the Plaintiff's primary duty is the performance of office or non-manual work directly related to the management or general business operations of the Defendant or the Defendant's customers.  The Defendant is a company that provides transportation services to some of the largest companies in the railroad industry.  The Defendant provides this service twenty-four (24) hours a day, seven (7) days a week to ensure that crews arrive at their required destination safe and ready to work.  Plaintiff's job was directly related to the management or general business operations of providing transportation services in that she assisted with running or servicing the business in the field of safety to transport customers safely.  Plaintiff, among other things, gathered and analyzed data, assessed risk, solved problems, wrote recommendations, conducted investigations, and created action plans to support the management or general business operations of her employer.

"The phrase 'directly related to the management or general business operations,'" within the context of the second element, "refers to the type of work performed by the employee." Calderon v. GEICO Gen. Ins. Co., 809 F.3d 111, 122 (4th Cir. 2015); citing, 29 C.F.R. § 541.201(a); see Desmond I, 564 F.3d at 693 ("Both the FLSA and its regulations make clear that an employee is exempt based on the type of work performed by that individual." (emphasis in original)).  "To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." Calderon v. GEICO Gen. Ins. Co., at 123.  Since the type of work performed by the Plaintiff involves the review, evaluation, and recommendation of business policies and strategies, which help to shape

and define PTI business operations regrading transportation services, her primary duties assisted with running or servicing the business in the field of safety.  Therefore, Element 2 has been met.

As to the third element (notwithstanding the advisory jury's verdict), the Court finds that the Plaintiff's primary duties include the exercise of discretion and independent judgment with respect to matters of significance.  The type of work performed by the Plaintiff included matters of significance, such as the authority to affect, interpret, and implement policies and procedures, the development and recommendation of discipline and training for risky drivers to address safety issues and thereafter implementing and following up on the implementation of action plans. Plaintiff exercised discretion and independent judgment with respect to these matters by conducting investigations, analyzing facts, comparing options, and recommending courses of action.  Plaintiff was involved in gathering and analyzing DriveCam data specific to drivers and sites, deciding what sites to visit and preparing agendas, investigating accidents, and developing solutions and recommending an action plan or course of action based on her analysis.  Plaintiff's recommendations could include removing drivers from service, recommending termination of drivers, or other disciplinary measures.  Plaintiff identified risk and improvement opportunities, utilized critical thinking related to safety, and measured and reported safety data to mitigate risk. For the most part, Plaintiff worked alone and/or remotely with little day to day oversight from Senior Director of Safety Vincent.  Therefore, the Court finds that Element 3 has been met.

Accordingly, Defendant PTI has met its burden of proof and has shown by clear and convincing evidence that Plaintiff's primary duty is directly related to the management or general business operations of providing transportation services and that her primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

Therefore, the administrative exemption applies, and Defendant correctly classified Ms. Oglesby as exempt.[8]

## CONCLUSION

For the foregoing reasons, it is Ordered that the administrative exemption applies, and Defendant correctly classified Ms. Oglesby as exempt.

**AND IT IS SO ORDERED.**

Joseph Dawson, III
United States District Judge

September 14, 2021
Greenville, South Carolina

---

[8] Because the Court finds that the administrative exemption applies, the issues of whether Defendant's actions were willful and whether the Plaintiff should be granted liquidated damages are moot.